NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

1st Circuit Court-Berlin Family Division
Nos.   2020-0544
         2020-0554


IN RE G.B.

Argued: September 14, 2021
Opinion Issued: October 20, 2021


John M. Formella, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the New Hampshire Division for Children, Youth and Families.


Nixon Peabody LLP, of Manchester (Mark Tyler Knights, W. Daniel Deane, and Nathan P. Warecki on the brief, and Nathan P. Warecki orally), and CASA of New Hampshire (Betsy Paine, Caroline Delaney, and Sarah E. Warecki on the brief), for Court Appointed Special Advocates of New Hampshire.


Bianco Professional Association, of Concord (James J. Bianco, Jr., Brendan L. Wile, and Lisa M. Bianco on the brief, and Brendan L. Wile orally), for the respondents.


DONOVAN, J.  The Circuit Court (Greenhalgh, J.) issued an adjudicatory order finding that G.B., a minor, had been neglected, see RSA 169-C:3, XIX(b)

(Supp. 2020), but that the respondents, G.B.'s adoptive parents, were not at fault for the neglect. Subsequently, the court issued a dispositional order awarding legal custody of G.B. to the New Hampshire Division for Children, Youth and Families (DCYF) and requiring DCYF to seek placement for G.B. in a residential treatment facility. DCYF appeals both orders, and G.B.'s guardian ad litem (GAL), Court Appointed Special Advocates of New Hampshire (CASA), joins in appealing the dispositional order. We conclude that the circuit court erred as a matter of law when it ruled that the respondents did not neglect G.B. We further conclude that, although the circuit court did not err by ruling G.B. a neglected child and ordering G.B.'s placement in a residential treatment facility, it failed to identify legally permissible primary and concurrent case plans in its dispositional order. Accordingly, we affirm in part, reverse in part, vacate in part, and remand.

## I. Facts

The following facts were found by the circuit court or are supported by the record. G.B. is a fourteen-year-old girl who has been diagnosed with several mental disorders, including bipolar disorder, reactive attachment disorder, and autism spectrum disorder. The respondents adopted her when she was a toddler. Medical providers who have evaluated G.B. believe that her mental disorders stem, at least in part, from abuse that she experienced when she was an infant in her birth parents' custody. These disorders cause her to react angrily and emotionally towards her primary caregivers, often resulting in "extreme emotional outbursts that can last for hours." She also has difficulty comprehending social cues, which "impacts her ability to form social connections and function in social settings." Since her adoption, G.B.'s parents have struggled to obtain appropriate treatment for her disorders.

On February 2, 2020, G.B. was hospitalized for several days following an incident of physical aggression toward her after-school caretaker. On February 10, when G.B. was ready for discharge, her parents refused to retrieve her from the hospital, asserting that they did not feel safe with G.B. in their home. A hospital social worker testified that the parents inquired about residential treatment for G.B., but, based upon G.B.'s behavior during her hospitalization, her clinicians found "no clinical indication" that residential treatment was necessary or appropriate at that time. According to the social worker, the clinicians recommended that G.B. return home "with the use of . . . a community mental health agency for therapy and psychiatry support." Because G.B.'s parents remained unwilling to bring her home, the hospital social worker reported the situation to DCYF. On February 12, DCYF filed petitions against both parents alleging neglect, along with an emergency ex parte petition to obtain protective supervision of G.B. The circuit court granted the ex parte petition, and, on February 24, G.B. was discharged from the hospital and placed in foster care.

2

On June 25, the circuit court held an adjudicatory hearing on the neglect petitions. According to the circuit court, "the evidence show[ed] that [the parents] have had a long and difficult relationship with DCYF and other social and educational agencies that have attempted to offer them services for [G.B.]." The parents countered DCYF's case with testimony and written reports from multiple mental health providers who, based upon their evaluations of G.B., recommended that G.B. receive intensive treatment in a residential treatment facility, rather than at home or in foster care, where she is most symptomatic.

On July 29, the circuit court issued an order finding that G.B. was a neglected child, as that term is defined by RSA 169-C:3, XIX(b), but that her parents were not at fault for the neglect. The court concluded that when the parents refused to retrieve G.B. from the hospital, they did not leave her "without care, control, subsistence or education," as required by RSA 169-C:3, XIX(b). Instead, the court described the parents' actions as "a desperate attempt to provoke the state into providing proper treatment and avoid a situation which was going to occur again resulting in serious injury" to G.B., her parents, or someone else. The court also found that the parents "have provided proper parental care and control, subsistence and education to [G.B.], as was within their ability, given the limitations presented by her mental illness and the paucity of appropriate services available to them."

Nonetheless, the court concluded that G.B. had been neglected, citing the "inaccessibility of necessary services [as] the basis for a finding of neglect in this matter, as they . . . are necessary to insure [G.B.'s] physical, mental and emotional health." In reaching this conclusion, the court interpreted RSA 169-C:3, XIX(b) as allowing "for a finding of neglect where parents are doing everything within their power to care for their child, but become overwhelmed by the increasing demands of care," and "through no fault of their own, are unable to provide the care and control necessary for the physical, mental or emotional health of their child." Accordingly, the court awarded DCYF legal custody and ordered it to "actively seek placement for [G.B.] in . . . [an] institution that will provide a high quality therapeutic residential program." The court ordered that "[p]lacement in a foster home should be considered a temporary placement lasting only until such a therapeutic placement is identified."

DCYF filed a motion to reconsider and stay the residential placement, arguing, in part, that RSA 169-C:3, XIX(b) does not allow for a finding of neglect without attributing the neglect to the parents. DCYF further argued that the court erred by finding that the parents did not neglect G.B. and by ordering DCYF to seek placement for G.B. in a residential treatment facility. The circuit court denied DCYF's motion.

On August 26, the court held a dispositional hearing. Prior to the hearing, DCYF recommended that G.B. remain in foster care with reunification

3

as the primary goal and termination of parental rights and adoption as the concurrent plan. At the hearing, G.B.'s GAL stated that, in her opinion, G.B. had adjusted well to her foster home, where she had resided since February 24. In her report, the GAL opined that a more restrictive environment would not serve G.B.'s best interests and recommended that G.B. continue living with her foster family. G.B.'s foster mother agreed, describing G.B.'s progress in a letter submitted to the court. The parents, on the other hand, objected to DCYF's proposed case plan and submitted supplemental reports from the same mental health providers who testified at the adjudicatory hearing.

On September 3, the court issued a dispositional order awarding DCYF legal custody of G.B. and declining to order reunification as the case plan goal. The court stated, in part:

> Given the medical opinions [submitted by the parents], it may not be possible for [G.B.] to ever reunify with her parents. The most appropriate relationship going forward may be that of [G.B.] receiving treatment she needs in an institutional setting in which she lives and maintaining a limited relationship with her parents from that distance. That of course remains to be seen. Dispositional Orders can be amended, however, at this time, the goal of reunification does not appear to be appropriate and is likely to misdirect the services this family needs.
>
> . . . .
>
> [T]he goal shall not be reunification, but rather a placement that addresses and provides appropriate treatment for [G.B.'s] complex diagnosis with a goal towards her successful education and wellbeing, in a manner that preserves, to the extent possible her relationship with her parents.

Despite ordering the parties not to pursue reunification as the primary case plan, the court listed numerous conditions that the parents were required to satisfy before G.B. could return to their custody. The court also listed "guardianship with an appropriate party" as the concurrent plan, but did not identify the prospective guardian. Pursuant to the dispositional order, G.B. was placed in a residential treatment facility in another state.

DCYF filed a motion to reconsider, arguing, in part, that the court's order failed to establish a legally permissible case plan, see RSA 169-C:21, II (2014), or concurrent plan, see RSA 169-C:19, III(a) (2014). Accordingly, DCYF requested the court to identify reunification as the case plan, and adoption and termination of parental rights as the concurrent plan, and to reconsider its order requiring DCYF to seek residential treatment for G.B.

4

The court denied DCYF's motion, observing that RSA 169-C:21, II "does not require a court to specify conditions under which a parent and child may be reunited when no conditions exist under which reunification could safely occur" and noting that, in any event, the dispositional order "comprehensively list[ed] objectives the parents must meet before [G.B.] may be returned." The court further explained that "[r]eunification has not been eliminated as a permanency option" and clarified that, in its supplemental dispositional order, it found only that reunification was not appropriate "<u>at this time</u>." With respect to DCYF's proposed concurrent plan of termination and adoption, the court ruled that "termination and adoption[] is not an appropriate approach to case planning for [G.B.], who has already been adopted after [her] birth parents' rights were terminated." The court reasoned that G.B.'s diagnosis "makes termination and adoption at permanency a recipe for another failure" and that the court is not required to "elevate one concurrent option over another, particularly when the facts of the case show a specific option will not serve the best interest of [G.B.]." This appeal followed.

On March 3, 2021, prior to oral argument in this case, the circuit court held a six-month review hearing and issued an order finding that both parents were "in substantial compliance" with the conditions set forth in the dispositional order. The court stated that G.B. had been in an out-of-home placement since February 20, 2020, and that DCYF had not made reasonable efforts to make it possible for her to be returned home because "[t]he Court [had] ordered that [she] not be returned home but rather placed in residential care." The court also changed the concurrent plan from "guardianship with an appropriate party" to "adoption (through termination or surrender of parental rights)." G.B. was scheduled to remain at the facility until at least September 2021.

On appeal, DCYF argues, in part, that the circuit court erred by: (1) interpreting RSA 169-C:3, XIX(b) as allowing it to "enter[] a finding of neglect, without having to assess blame for the neglect on any action taken by [G.B.'s parents]"; and (2) finding that G.B.'s parents did not neglect G.B. when they refused to retrieve her from the hospital upon discharge. Together with CASA, DCYF also argues that the circuit court erred by failing to identify legally permissible primary and concurrent case plans, as required by RSA 169-C:21, II and RSA 169-C:19, III(a). In addition, CASA argues that the circuit court erred by ordering G.B.'s placement in an out-of-state residential treatment facility when, in its view, other, less restrictive options were available in New Hampshire.

## II. Standard of Review

When reviewing final orders in abuse and neglect cases, we will uphold the findings and rulings of the circuit court unless they are unsupported by the evidence or tainted by error of law. In re Craig T., 144 N.H. 584, 585 (1999).

5

As the trier of fact, the circuit court is in the best position to assess and weigh the evidence before it.  Id.  Thus, our task is not to determine whether we would have found differently, but, rather, whether a reasonable person could have found as the circuit court did.  Id.

### III. Analysis

We first address DCYF's argument that the circuit court erred by finding that the parents did not neglect G.B. when they refused to retrieve her from the hospital upon discharge.  DCYF bears the burden of proving neglect by a preponderance of the evidence.  See RSA 169-C:13 (2014).  A "neglected child" is defined, in relevant part, as:

> [A] child . . . [w]ho is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, when it is established that the child's health has suffered or is likely to suffer serious impairment; and the deprivation is not due primarily to the lack of financial means of the parents, guardian, or custodian.

RSA 169-C:3, XIX(b); see RSA 169-C:3, XXVII-a (Supp. 2020) (defining "serious impairment" as "a substantial weakening or diminishment of a child's emotional, physical, or mental health or of a child's safety and general well-being").  "[S]tatutory neglect is not the actions taken or not taken by the parent or parents, but rather it is the likelihood of or actual serious impairment of the child's physical, emotional, and mental well being that are the conditions of neglect that must be repaired and corrected in the [circuit] court process."  In re J.H., 171 N.H. 40, 49 (2018) (quotation omitted).

This case is similar to In re M.M., where we upheld a finding of neglect against a father who refused to take custody of his son upon the son's discharge from the hospital.  In re M.M., 174 N.H. 281, 285-86, 297 (2021).  The son had been the subject of an ongoing child in need of services (CHINS) case, and, similar to G.B., had been hospitalized following an incident of aggression toward his mother and half-siblings.  Id. at 284-85.  On appeal, the father argued that his failure to retrieve his son from the hospital was not neglectful because it did not cause the son to "suffer serious impairment," RSA 169-C:3, XIX(b).  Id. at 295.  Rejecting this argument, we observed that the father "may have conflated the fact that [the son] has underlying mental health and behavioral conditions with the statutory concept of 'serious impairment' . . . in the context of [the son] having no one to care for him upon being ready for discharge from the hospital."  Id.  We noted that "[c]hildren are dependent on their parents for physical and emotional health and safety, including their need for a safe shelter."  Id. at 296 (citation omitted).  Thus, we upheld the circuit court's findings that, by refusing to take custody of his son or arrange a safe

6

place for him to stay upon discharge, the father failed to provide the proper parental care or control necessary for his son's physical, mental, and emotional health, and placed the son at risk of serious impairment.  See id. at 297; see also RSA 169-C:3, XIX(b).

Here, similar to M.M., the parents refused to retrieve G.B. from the hospital when she was ready for discharge.  As DCYF correctly observes, the parents' "refusal to pick [G.B.] up from the hospital . . . left [her] with nowhere to live, no one to feed her, and no one to ensure that her physical and emotional needs were met."  We therefore agree with DCYF that the parents' "decision to forgo all of their parental responsibilities to [G.B] deprived [her] of the 'proper parental care or control' to which she is entitled."  (Quoting RSA 169-C:3, XIX(b).)

Even if, as the circuit court observed, the hospital was capable of providing G.B. "care, control, subsistence [and] education," the parents remained responsible for G.B.'s emotional well-being.  See RSA 169-C:3, XIX(b). Although some parental obligations may be discharged by delegation, see In re Adam M., 148 N.H. 83, 84 (2002), "[c]aring for a child's emotional well-being" requires a parent's "active involvement," In re Thomas M., 141 N.H. 55, 58 (1996).  Leaving G.B. unnecessarily hospitalized for several days was not a permissible delegation of parental responsibility.  See id. at 58-59; M.M., 174 N.H. at 295-297.  We therefore conclude that, by ruling that the parents did not neglect G.B. when they refused to retrieve her from the hospital, the circuit court erred as a matter of law.  In light of this ruling, we need not address DCYF's argument that the circuit court misinterpreted RSA 169-C:3, XIX(b) as allowing it to enter a finding of neglect without attributing fault for the neglect to G.B.'s parents.

We next address CASA's argument that the circuit court erred by ordering out-of-state residential treatment for G.B. when less restrictive in-state options were available.  To support this argument, CASA relies upon RSA 169-C:6-b, III (Supp. 2020), which states that an order removing a child from his or her home must "include specific written findings regarding the need for the out-of-home placement" and "briefly state the facts the court found to exist that justify ordering the placement."  CASA also points to RSA 169-C:19-b (2014), which creates "a presumption that an in-state placement is the least restrictive and most appropriate placement" and provides that "[t]he court may order an out-of-state placement only upon an express written finding that there is no appropriate in-state placement available."

We disagree with CASA's contention that the circuit court's dispositional order violated RSA 169-C:6-b, III and RSA 169-C:19-b.  In its supplemental dispositional order, the court found that "based on the evidence before [it]," G.B.'s "needs are significant and . . . will not be met by residential placement in a foster home or by standard counseling and medical treatment."  The court

acknowledged reports from G.B.'s GAL and foster mother that G.B. had exhibited "marked improvement in her [foster] placement." Nonetheless, the court credited the expert opinions of G.B.'s medical providers who, based upon their evaluations of G.B., recommended residential treatment. The court observed that these experts had "determined that [G.B.] needs intensive and structured treatment if she is to ever have a chance of reunification with her parents or a fulfilling future." The court found that G.B.'s "long term needs will not be addressed in her present placement" with her foster family, "regardless of how she might be doing after several months." The court also noted that "there [was] no countervailing opinion by a qualified expert regarding [G.B.'s] diagnosis and treatment and present reports of her success are anecdotal and observational." Therefore, based upon its supplemental dispositional order, we conclude that the circuit court made "specific written findings regarding the need for the out-of-home placement" and stated sufficient facts to justify ordering that placement. RSA 169-C:6-b, III.

With respect to CASA's argument that the dispositional order violated RSA 169-C:19-b, the court explained in its dispositional order that one of G.B.'s medical providers "had identified several institutions that she believe[d] [would] best serve [G.B.'s] needs" and all were located out-of-state. The court further noted that, among the two in-state institutions that DCYF had considered for G.B.'s placement, the medical provider believed that G.B.'s current out-of-state placement was the only institution that offered appropriate services for G.B.'s needs. Therefore, even if the court's order could be interpreted as requiring out-of-state placement, the record supports the court's finding that placement at a residential treatment facility outside of New Hampshire was "the least restrictive and most appropriate placement" for G.B. at that time, and the court satisfied its obligation of making an "express written finding" that in-state placement was unavailable. RSA 169-C:19-b.

Nonetheless, despite the circuit court's finding that out-of-state residential treatment was the least restrictive and most appropriate placement for G.B. at the time of disposition, we agree with DCYF and CASA that the court failed to identify legally permissible primary and concurrent case plans in its dispositional order. After the circuit court makes a finding of neglect, its dispositional order must include a case plan setting forth "conditions the parents shall meet before the child is returned home," together with "a specific plan which shall include, but not be limited to, the services the child placing agency will provide to the child and family." RSA 169-C:21, II. If the child is placed out of his or her home, the dispositional order must also include a "concurrent plan for the child." RSA 169-C:19, III(a); see RSA 169-C:3, VII-a (2014) (amended 2021) (defining "concurrent plan" as "an alternate permanency plan in the event that a child cannot be safely reunified with his or her parents").

Once the child has been in out-of-home placement for twelve or more months, the court must hold a permanency hearing. RSA 169-C:24-b, I (2014) (amended 2021). At the hearing, the court must "determine whether and, if applicable, when the child will be returned to the parent or parents, pursuant to RSA 169-C:23." RSA 169-C:24-b, II (2014) (amended 2021). If, by the time of the permanency hearing, the parents have not satisfied the standard for return set forth in RSA 169-C:23 (2014), the court must "identify a permanency plan other than reunification for the child." Id. Alternative permanency options include: (1) "[t]ermination of parental rights or parental surrender when an adoption is contemplated"; (2) "[g]uardianship with a fit and willing relative or another appropriate party"; or (3) "[a]nother planned permanent living arrangement." Id.

On appeal, DCYF argues that G.B. "is entitled to pursue a primary plan of reunification" and that, "[b]y ordering DCYF not to pursue reunification efforts, the court placed additional limits on the already short period of time this family has to reunify." (Bolding and capitalization omitted.) We agree. There is a presumption that reunification will be the case plan goal for the first twelve months of any child's out-of-home placement. See RSA 169-C:21, II (requiring final dispositional orders to "include conditions the parents shall meet before the child is returned home"); RSA 169-C:24-b, I-II (providing that, after a child has been in out-of-home placement for twelve or more months, the court must hold a permanency hearing and "determine whether and, if applicable, when the child will be returned to the parent or parents"); see also RSA 169-C:3, VII-a (defining "concurrent plan" as "an alternate permanency plan in the event that a child cannot be safely reunified with his or her parents").

If, however, "no conditions exist under which reunification could safely occur," the court need not "attempt to specify conditions under which a parent and child may be reunited." In re Melissa M., 127 N.H. 710, 714 (1986); see RSA 169-C:21, II. In such cases, the presumption of reunification does not apply, and the court is required to consider whether termination of parental rights is the next best option. See In re Adam E., 125 N.H. 368, 370 (1984) (stating that if "it would be vain to set conditions and to order a plan of services" for reunification, DCYF "should consider the possibility of a petition to terminate parental rights under RSA chapter 170-C"); see also Petition of N.H. Div. for Children, Youth and Families, 170 N.H. 633, 640 (2018) ("If reunification is not appropriate, then the second option is adoption and a petition for termination of parental rights. If neither option is appropriate, the court must next consider referral for legal guardianship." (quotation omitted)).

Here, the circuit court stated in its supplemental dispositional order that "the goal of reunification does not appear to be appropriate and is likely to misdirect the services this family needs." Instead of adopting the primary goal of reunifying G.B. with her parents, the court adopted the primary goal of

9

placing G.B. in "a placement that addresses and provides appropriate treatment for [her] complex diagnosis with a goal towards her successful education and wellbeing, in a manner that preserves, to the extent possible her relationship with her parents." However, the court did not conclude that "no conditions exist under which reunification could safely occur." Melissa M., 127 N.H. at 714. To the contrary, the dispositional order listed numerous conditions that G.B.'s parents were required to satisfy before G.B. could return to their custody. In its order denying DCYF's motion for reconsideration, the court also clarified that "[r]eunification has not been eliminated as a permanency option." Based upon this language, we interpret the dispositional order as concluding that, although reunification was not appropriate at the time the circuit court reached its decision, it may become possible at some point in the near future. Thus, absent a finding that "it would be vain" to pursue reunification, Adam E., 125 N.H. at 370, the circuit court should not have rejected reunification as the primary case plan goal.

Finally, DCYF and CASA argue that the dispositional order deprived G.B. of a legally permissible concurrent plan. RSA 169-C:19, III(a) requires the circuit court to identify a concurrent plan for any child in an out-of-home placement. "Concurrent plan" is defined as "an alternate permanency plan in the event that a child cannot be safely reunified with his or her parents." RSA 169-C:3, VII-a. A concurrent plan may, therefore, comprise one of the following: termination of parental rights and adoption; guardianship with a fit and willing relative or another appropriate party; or another planned permanent living arrangement. See RSA 169-C:3, XXI-c (2014) (defining "permanency plan"). However, the circuit court cannot identify the concurrent plan without first identifying the primary plan, which, as explained above, requires a preliminary determination of whether reunification is possible. See RSA 169-C:3, VII-a; RSA 169-C:19, III(a); RSA 169-C:21, II; see also Melissa M., 127 N.H. at 714; Adam E., 125 N.H. at 370. Accordingly, because the circuit court failed to identify a legally permissible primary case plan — rejecting reunification as the case plan goal, despite determining that reunification remained possible — we vacate both the primary and concurrent case plans, and we remand for the circuit court to issue another dispositional order.

Affirmed in part; reversed in part; vacated in part; and remanded.

HICKS AND HANTZ MARCONI, JJ., concurred.

10